Filed 3/10/25  P. v. Sumler CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ELAJAH TIMOTHY SUMLER,<br><br>  Defendant and Appellant. | B334120<br><br>(Los Angeles County<br>Super. Ct. No.<br>SA106154) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed.

Corey J. Robins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Elajah Timothy Sumler appeals the judgment after a jury trial in which he was convicted of one count each of battery causing serious bodily injury (Pen. Code, § 243, subd. (d)),[1] battery on a police officer (§ 243, subd. (b)) vandalism (§ 594, subd. (a)), mayhem (§ 203), assault with a deadly weapon (§ 245, subd. (a)(1)); and two counts of resisting, obstructing, or delaying a peace officer in the performance of his or her duties (§ 148, subd. (a)). Appellant was sentenced to nine years in state prison.

Appellant contends reversal is required due to the erroneous denial of his motion for self-representation, various evidentiary errors, prosecutorial misconduct, ineffective assistance of counsel, and cumulative error. He also argues that insufficient evidence supports his mayhem conviction. We reject appellant's challenges and affirm the judgment.

## FACTUAL BACKGROUND

I.   **The Prosecution Case**

   *A. Appellant's theft and fight with the security guard*

On March 3, 2022, appellant entered a Vons grocery store in Santa Monica, walked "straight to the candy aisle," and "stuff[ed] . . . his pockets" with candy until it overflowed onto the floor. Appellant made eye contact with the store's security guard before leaving the store without paying. Appellant returned to the store several minutes later wearing a backpack with a large metal cane and skateboard affixed to it. The guard informed the store manager, and then accompanied him to tell appellant to leave. While they escorted him out of the store, appellant told each of them, "You a bitch," and "I'm gonna slay you." He also cussed at customers in the store and called them "bitches." Once

---

[1] Undesignated statutory references are to the Penal Code.

2

the three men left the store, appellant fell silent, and the guard—believing the confrontation was over—turned and walked back toward the store.

As the guard walked away from him, appellant followed the guard and swung his metal cane at him, striking him in the mouth. Appellant said, "Yea. I told you [I'm gonna] slay you," and swung his cane a second time, but the guard grabbed it before it struck him. A fistfight ensued. After swinging at the guard and missing, appellant grabbed him in a "bear hug" and repeated, "Ima slay you. I told you [I'm gonna] slay you." To escape from appellant's grasp, the guard hit appellant in the forehead. Appellant then pulled his skateboard out and tried to hit the guard with it. The guard grabbed the skateboard and threw it at appellant's legs. The fight eventually "just stopped," and appellant walked away.

### B. *The guard's injuries*

The blow to the guard's mouth shattered his teeth, "pushed back" his gums, and left his "raw nerve" exposed to the wind, causing pain that was a "12" "on a scale of one to 10." He "ended up getting four root canals," "three different bridges," and no longer has a "beautiful smile," in part because his "gums are pushed back," making his front teeth appear bigger. Since the injury, eating has felt "weird."

### C. *Events after the police arrived*

When the police arrived, they told appellant to "sit down and drop what was in his hands." Appellant did not comply, and a struggle ensued during which appellant "thrash[ed] his body side to side," "bucking" the officers away and taunting them. When the police finally arrested appellant, they took him to the

hospital.  He was cleared and then taken to the jail in Santa Monica.

Officer Steven Jaen and his partner Officer Alexander Aleshkevich were tasked with taking appellant from Santa Monica to the inmate reception center in downtown Los Angeles. As Officer Jaen placed appellant into his car, appellant "vomited on the left side of [Officer Jaen's] pants . . . and [the] vehicle." Appellant was taken to the emergency room in Santa Monica for medical attention, where he vomited on three separate occasions in front of staff.  "[E]very time a new staff member or nurse or doctor showed up . . . he vomited in front of them."  Appellant was medically cleared and placed back into the patrol car to be taken to the inmate reception center.

While in the back of the patrol car, appellant managed to unbuckle his seatbelt.  He then lay across the backseat and maneuvered his handcuffs to the front of his body.  When the three men reached the reception center, the officers got out of their car to retrieve appellant from the back seat.  Appellant pretended to sleep, but Officer Jaen observed him opening and closing his eyes.  Officer Aleshkevich shook appellant to get his attention, and appellant became "aggressive and physically violent with the officers."  Appellant reached with both his hands to grab Officer Aleshkevich's arm and wrist, and the officer pulled away.  Appellant stated multiple times that he was "having a mental breakdown."  He destroyed the camera in the backseat of the patrol vehicle.  The officers took appellant to be evaluated by a nurse at the jail center.  When the nurse arrived, appellant vomited at her while she examined him.  The facility declined to house him, and Officer Jaen took appellant back to the Santa Monica jail.

4

## II.     The Defense Case

The defense investigator interviewed a witness of the incident at the Vons, who reported that he was leaving the store when he saw the guard and appellant interacting.  He said he "saw security put a bear hug around [appellant] as he's walking him out."

Appellant testified in his own defense.  He explained that he went to Vons to "purchase" some candy, and that the security guard and manager followed him in the store.  Appellant told them that if they kept following him, "we're going to have to fight and I don't want to fight." The guard walked in front of him, took his badge off, and placed it on the ground, saying "come at me." Appellant responded, "No, I'm not going to attack you.  If you want to fight you're going to have to hit me first."  Appellant denied calling the guard a "bitch" or saying "I'm going to slay you."  The guard walked toward appellant and "grab[bed] and push[ed] [his] head," at which point appellant "swung [the cane] around" and "hit him in the face."  Appellant "didn't intend to swing the cane" or hit the guard.  In any case, the cane "barely touched him," and appellant "didn't even hit him that hard."  The guard grabbed appellant's face and hit him "multiple times" in his "head, on [his] arms, everywhere."  The guard hit appellant "30 or 40 times and [appellant] didn't hit him back at all."

The next thing appellant knew, officers were "telling [him] to get on the ground."  The police did not tell him why he was being arrested.  They just told him to get down, and "out of nowhere . . . one of them just hopped on [him] . . . from behind . . . and then [appellant] was really nauseous."

5

**DISCUSSION**

**I.    The Trial Court Acted Within Its Discretion in Denying Appellant's Untimely *Faretta*[2] Motion**

**A. *Background***

On August 7, 2023, days before trial was to begin, appellant moved for new counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).  The trial court held a hearing, and appellant complained about his counsel's trial strategy; that she had told him she had no defense for him; her failure to subpoena a critical witness; and her "complete disregard" for his "side of the story."  Appellant expressed that "no one even tried" to obtain surveillance camera footage, and defense counsel explained that it was a tactical choice not to introduce such footage.  The court denied the *Marsden* motion, finding that defense counsel was performing to standard.  It also denied appellant's request for a continuance to hire private counsel.

Appellant then stated his desire to "go [] pro per."  The trial court responded, "That request is denied at this time."  Appellant asked, "What is your reason?" and the court responded, "Because you would not be ready to proceed to trial.  You are going [] pro per?  You are ready right now?"  Appellant responded, "I'm ready right now."  The court then told him to "discuss it with [department] 100 when [he] get[s] there."[3]  The court handed appellant a *Faretta* waiver form to fill out for the next hearing, but appellant refused to take it.

---

[2] *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (*Faretta*).

[3] Appellant was wheelchair bound, so was transferred to an accessible department for trial.

On August 10, 2023, appellant and his counsel appeared before the trial judge. Defense counsel told the court that appellant wished to represent himself, and appellant then completed a *Faretta* waiver form. The trial court asked appellant why he wanted to represent himself. Appellant explained that he felt he was "better than [his] counsel" and had successfully represented himself at a preliminary hearing in the past, and his counsel had told him that she had no defense for him. Appellant also asserted that a critical witness had not been subpoenaed, to which his counsel responded that "she was successfully subpoenaed," but that counsel did not intend to call her because she had not seen the whole incident and "appear[ed] to be mentally unwell."

Before stating its findings, the court noted for the record that appellant was present "in court in a suicide vest [and] wearing a helmet." The court continued, "[Appellant] presents as mentally ill. I don't have an alienist report, but given the reports that are in the court file I have serious doubts about whether [appellant] is mentally competent to represent himself. Certainly his rambling presentation in court this afternoon causes me to have some problems with that. But, more significantly, . . . my take is that he does not really wish to represent himself. The notes from the other court are replete with references to him obtaining other counsel, him having *Marsden* hearings, never a discussion about him representing himself. And I don't think that that's what he wants. I think he wants a different attorney."

Appellant spoke up: "I told [my counsel] when I first met her I was going to represent myself and that's the first thing we talked about, the first conversation that we had. And you can ask her and she could tell you the truth about that. . . . And she

7

told me, 'Well, if you're going to represent yourself I'm not going to do anything.' I said, 'That's fine.' "

The court responded: "Mr. Sumler, the other concern I have is that as we've gone through these proceedings this afternoon you do not seem to be able to control yourself in court. You talk over me. You interrupt and disrupt the proceedings." "So, based on that, the fact that I don't think there's a free and voluntary waiver of counsel, I'm concerned about Mr. Sumler's competence to represent himself."

The trial court then denied appellant's *Faretta* motion. While the court explained that his counsel would continue to represent him, appellant interjected: "You're forcing me to go to trial with somebody that I don't want to be represented by when I wanted to represent myself. And that's my right by law."

The trial court asked appellant if he wanted to wear the helmet and suicide vest to trial, and appellant responded, "You're forcing me to lose in trial. She says she has no defense for me."

The court reassured appellant that it was not forcing him to lose and began to repeat his question when appellant stated, "I feel very suicidal because of your ruling. I feel like if you put me in civilian clothes I'll do my best . . . to kill myself." The court replied, "That settles it then."

Defense counsel and the court turned to discuss appellant's custody credits, and appellant interrupted multiple times. The court told appellant, "We have this constant interrupting that makes me feel better and better about my ruling . . . not allowing you to represent yourself because you can't comport yourself [in] court appropriately. If you keep interrupting me[,] we'll send you back to the lockup and we'll proceed without you. Clear?" Appellant responded, "Absolutely." Later in the hearing,

appellant asked the court a question, and the court told him not to address the court directly and to speak to his attorney.

**B. *Law governing the right to self-representation***

"A criminal defendant has the constitutional right to forgo the constitutional guarantee of the assistance of counsel and to represent himself at trial." (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1515; see generally *Faretta, supra,* 422 U.S. 806.) "A trial court must grant defendant's request for self-representation if the defendant knowingly and intelligently makes an unequivocal and timely request after having been apprised of its dangers." (*People v. Valdez* (2004) 32 Cal.4th 73, 97–98 (*Valdez*); *Faretta, supra,* 422 U.S. at p. 835.) The right to represent oneself is not absolute, however. (*Indiana v. Edwards* (2008) 554 U.S. 164, 171 [128 S.Ct. 2379, 171 L.Ed.2d 345]; *People v. Mickel* (2016) 2 Cal.5th 181, 206.)

For example, the trial court has discretion to deny a defendant's request to represent himself if the request is untimely (*People v. Lynch* (2010) 50 Cal.4th 693, 722 (*Lynch*), abrogated on another ground by *People v. McKinnon* (2011) 52 Cal.4th 610, 636–637; *People v. Windham* (1977) 19 Cal.3d 121, 124, 129, fn. 6 [an untimely request is based on nonconstitutional grounds and whether to grant it rests "within the sound discretion of the trial court"]; accord, *People v. Frazier* (2024) 16 Cal.5th 814, 843–844), or if he engages in disruptive conduct that "seriously threatens the core integrity of the trial" (*People v. Carson* (2005) 35 Cal.4th 1, 6; *People v. Welch* (1999) 20 Cal.4th 701, 735).

**C. *The* Faretta *motion was untimely***

The People argue that the denial of appellant's *Faretta* motion should be affirmed because it was untimely and thus a

9

matter of the court's discretion.  (See *Valdez, supra*, 32 Cal.4th at p. 103.)  Appellant responds we may not rely on untimeliness because the trial court did not consider it, citing *People v. Orosco* (2022) 82 Cal.App.5th 348, 362, and *People v. Best* (2020) 49 Cal.App.5th 747, 762.  On this point we disagree with appellant, *Orosco*, and the majority opinion in *Best*.  That the trial court did not expressly find the motion untimely does not preclude us from affirming its ruling on that ground.  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 433, fn. 15 ["[e]ven when the trial court does not state it is denying a *Faretta* motion on the ground of untimeliness, we independently review the record to determine whether the motion would properly have been denied on this ground"], citing *People v. Dent* (2003) 30 Cal.4th 213, 218; *People v. Boyce* (2014) 59 Cal.4th 672, 703; *Best*, at p. 773 & fn. 5 (dis. opn. of Brown, J.); *People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12 [" '[W]e review the ruling, not the court's reasoning, and, if . . . correct on any ground, we affirm' "].)

A *Faretta* motion is timely if it is made " ' "within a reasonable time prior to the commencement of trial." ' "  (*People v. Wright* (2021) 12 Cal.5th 419, 436 (*Wright*); *People v. Johnson* (2019) 8 Cal.5th 475, 499.)  In determining whether a *Faretta* motion is timely, a court may consider "not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses . . . , the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation."  (*Lynch, supra*, 50 Cal.4th at p. 726.)  The "reasonable time" requirement must not be used to limit a defendant's constitutional right of self-representation, but rather to prevent the defendant from

10

misusing the *Faretta* mandate to unjustifiably delay a scheduled trial or obstruct the orderly administration of justice. (*Wright*, at p. 436; *People v. Johnson*, at p. 499.) The Supreme Court has "declined to articulate what standard a reviewing court should apply in determining whether a request for self-representation is timely." (*Wright*, at p. 437.) Appellant's motion was untimely whether we apply de novo review or a more deferential standard.

The complexity of the case weighs against finding appellant's motion timely: He faced seven counts, involving six different offenses and multiple victims. There were numerous witnesses to the underlying events, several of which were called to testify. Appellant unequivocally moved to represent himself only after his case had been transferred to the trial department and after both sides had announced their readiness to go to trial. (See *People v. Burton* (1989) 48 Cal.3d 843, 853–854 [court properly concluded motion was untimely where made "after the case had been called for trial, both counsel had answered ready, and the case had been transferred to a trial department for pretrial motions and jury trial"].) Although appellant sought to represent himself at the prior hearing, that request was equivocal—he made it out of apparent frustration, immediately after the court's denial of both his *Marsden* motion and his subsequent request for a continuance to hire new counsel.[4] (*People v. Scott* (2001) 91 Cal.App.4th 1197, 1206 (*Scott*) [request made immediately after denial of motion for new counsel was equivocal; context showed motion was made "out of frustration" "rather than from a genuine desire to represent himself"].)

_____

[4] To the extent the trial court's statements suggest appellant had not made *any* prior request, this was at least correct insofar as he had not made an unequivocal request.

11

Appellant thereafter refused to accept the *Faretta* paperwork—behavior which suggests an inability to conduct himself in an orderly fashion were he to represent himself.  The trial court concluded, after reviewing "the notes from the other court," that appellant did not genuinely want to represent himself, implying it saw his request as a means to "obstruct the orderly administration of justice."  We agree and conclude that appellant's motion made on the eve of trial was untimely.  (*Wright*, *supra*, 12 Cal.5th at p. 436 [the " ' "reasonable time" ' " requirement is intended to prevent the defendant from misusing *Faretta* to " ' "unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice" ' "]; *People v. Marshall* (1997) 15 Cal.4th 1, 27 [*Faretta* motion made for purpose of delay properly denied]; *Lynch*, *supra*, 50 Cal.4th at p. 722 ["we have held on numerous occasions that *Faretta* motions made on the eve of trial are untimely"].)

### D. *The trial court did not abuse its discretion*

Because appellant's *Faretta* motion was untimely, we evaluate the trial court's decision to deny the motion for an abuse of discretion.  (*People v. Thomas* (2023) 14 Cal.5th 327, 398–399.)  Relevant factors for the court to consider are " ' "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." ' "  (*Id*. at p. 399.)  " 'A court abuses its discretion if it acts "in an arbitrary, capricious, or patently absurd manner" ' " "or 'when its ruling "falls outside the bounds of reason." ' "  (*Ibid*.)

Consideration of the relevant factors shows the trial court acted within its discretion in denying appellant's motion. Appellant had a proclivity to seek to substitute counsel: He filed a *Marsden* motion, and when that was denied, requested time to retain private counsel. The outcome of the *Marsden* motion and the trial court's discussion with appellant's counsel at both the *Marsden* and *Faretta* hearings provided a basis to find that appellant's counsel was doing the best she could under the circumstances.[5] Appellant appears to have made the *Faretta* motion out of frustration at having his request for new counsel denied. Appellant cited as a reason for his *Faretta* request his disagreement with his counsel over trial tactics, which is " 'an insufficient reason to grant an untimely *Faretta* request.' " (*Scott*, *supra*, 91 Cal.App.4th at p. 1206, quoting *People v. Wilkins* (1990) 225 Cal.App.3d 299, 309, fn. 4.) Appellant made his request on "the eve of trial," and trial was expected to last five to seven days. This timing, paired with the complexity of the case, number of witnesses, appellant's repeated interruptions during the *Faretta* hearing, and his threat to kill himself after the court expressed its intention to deny his motion all suggest that significant delay and disruption would result if appellant were allowed to represent himself. The denial of appellant's motion was thus within the bounds of reason.

## II.    Prior Misconduct Evidence

Appellant argues the trial court erred in admitting certain evidence of appellant's prior misconduct, requiring appellant to

---

[5] Defense counsel told the trial court at the *Marsden* hearing that appellant had called her "numerous times" each day, was "abusive on the phone," and had also called "numerous managers, other lawyers," and "supervisors" every day.

answer questions about whether officers had lied, and failing to admonish the jury after the prosecutor stated he was not going to go into appellant's "whole criminal history." We review challenges to the trial court's evidentiary rulings for an abuse of discretion. (*People v. Powell* (2018) 5 Cal.5th 921, 962.)

**A.** *Appellant's prior felony convictions*

**1. Relevant proceedings**

The prosecutor asked appellant if he was convicted of "multiple felony thefts," and appellant responded, "I would suppose." The prosecutor continued, "In fact, those involved violence, right, those events of theft?" Appellant replied, "I don't think so. I don't know."

The prosecutor then asked him whether he was convicted of "stealing from someone's immediate person on January 6, 2014?" Appellant questioned the relevance of his criminal record. The prosecutor continued, "So it's possible you were convicted of that. Here's one from June 26, 2015. On that day you walked into Home Depot and you stole. Police officers responded and you used force to resist?"

Defense counsel objected: "I believe that has to be a question regarding whether or not it was a conviction." The court replied, "I think under the circumstances of the case that's not correct."

The prosecutor asked, "On June 26, 2015, you walked into Home Depot. You stole. Police came and you forcefully resisted them, right?" Appellant responded, "Isn't that my story?" The prosecutor asked, "And you were convicted of petty theft and two counts of resisting an executive officer from force, right?" Appellant responded, "I suppose. Yes. . . . Yes to all of it."

## 2.  Governing law

"Evidence of circumstances underlying a conviction is admissible to impeach credibility if the proponent demonstrates the evidence has 'any tendency in reason' to disprove credibility. (Evid. Code, § 210; see *ibid.* [defining relevant evidence as 'having any tendency in reason to prove or disprove any disputed fact . . . of consequence to the determination of the action' including 'evidence relevant to the credibility of a witness']; Evid. Code, § 780 ['the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his [or her] testimony at the hearing . . .'].)" (*People v. Dalton* (2019) 7 Cal.5th 166, 214 (*Dalton*).)  To be admissible, past misconduct for impeachment must show moral turpitude, which is defined as " 'readiness to do evil.' " (*People v. Wheeler* (1992) 4 Cal.4th 284, 296; *People v. Contreras* (2013) 58 Cal.4th 123, 157, fn. 24.)  Trial courts retain discretion to exclude such evidence under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Dalton*, at p. 214.)

Although evidence of the underlying *conduct* may be admissible subject to the court's discretion, the fact of a misdemeanor conviction is generally not. (*People v. Cadogan* (2009) 173 Cal.App.4th 1502, 1514 (*Cadogan*).)  This is because " 'a misdemeanor conviction comes within the statutory rule of

inadmissible hearsay.' "[6] (*Cadogan*, at p. 1514, quoting *Wheeler*, *supra*, 4 Cal.4th at pp. 298–299.) Section 788 of the Evidence Code treats felony convictions differently, however, allowing their use for impeachment through "examination of the witness or by the record of the judgment," subject to the trial court's discretion under Evidence Code section 352. (Evid. Code, § 788; *People v. Anderson* (2018) 5 Cal.5th 372, 407.)

### 3. Analysis

Appellant argues that the trial court should have sustained his objection to the prosecutor's questioning on the conduct underlying his prior convictions because the only felony convictions from that date were for resisting an officer (§ 69), not theft, and there was no evidence showing appellant committed theft. Appellant's argument fails because it (1) is based on a probation report that appellant admits "was not in evidence," and (2) fails to recognize that a prior felony conviction used for impeachment "may be shown by the examination of the witness" (§ 788). Thus, appellant's affirmative response when asked whether he had been convicted of "multiple felony thefts" *is* evidence of his prior felony convictions, even though he now attempts to raise doubt as to the accuracy of his testimony.

Appellant asserts that the trial court "failed to apply [Evidence Code] section 352 . . . to the prosecutor's questioning," but he forfeited this argument by failing to raise it below. (*People v. Doolin* (2009) 45 Cal.4th 390, 437–438 (*Doolin*); Evid. Code,

---

[6] Evidence Code section 452.5 creates an exception to the hearsay rule by allowing prior convictions, including misdemeanors, to be shown through certain official records.

16

§ 353, subd. (a).)[7] Even if we interpret defense counsel's statement, "I believe that has to be a question regarding whether or not it was a conviction" as an objection under section 352, the admission of appellant's theft-related conduct and subsequent violence did not create undue prejudice to the extent that its admission would amount to an abuse of discretion.

Appellant relies on *People v. Gutierrez* (2018) 28 Cal.App.5th 85 (*Gutierrez*) to suggest that the prosecutor should have been prohibited from asking about the theft-related conduct underlying his prior convictions for resisting an officer. *Gutierrez* observed that where evidence of conduct underlying a prior felony used to impeach a witness has no additional bearing on dishonesty beyond the fact of the conviction itself, the trial court should "ordinarily . . . exclude evidence of the underlying conduct" because it is "likely to be more prejudicial than probative." (*Id*. at p. 90.) However, the *Gutierrez* court went on to distinguish itself from such cases because the conduct underlying the defendant's prior felony conviction of evading police officer—taking a car without the owner's consent— "substantially augmented the showing of dishonesty" where the defendant was charged with attempted carjacking and was claiming that he had asked the owner for his keys and that there had been a misunderstanding. (*Id*. at pp. 87, 90–91.) Similarly here, the theft-related conduct underlying appellant's prior felony

_____

[7] We are not persuaded by appellant's assertion that additional objections would have been futile, "given the court's other rulings and frustration with appellant." The record shows the court separately and duly considered each objection made, and gives us no reason to agree with appellant that any objections would have been futile, even if meritorious.

17

convictions augment the showing of appellant's dishonesty beyond the fact of his convictions because appellant here testified that he entered the Vons to "purchase" some candy, that he hadn't "do[ne] anything wrong," and that the police officers "just hopped on [him]" "out of nowhere." (See Evid. Code, § 780 [credibility may be determined based on consideration of "any matter that has any tendency in reason to prove or disprove the truthfulness of [the witness's] testimony"].)

Appellant further argues that the court erred in admitting the evidence because the prosecutor said he would use only one section 69 conviction. We disagree with this characterization of the record: Immediately before appellant was called to testify, defense counsel suggested that appellant "could perhaps make a record of" the "certain impeachment evidence or testimony" the prosecutor planned to introduce. The prosecutor responded, "It's the convictions, from all the convictions. A [section] 69 he was on probation for. He had a [section] 243(c) [battery against police officer] with a cane. So—" The court said, "Okay." Defense counsel stated, "Objection," the court responded, "Overruled." The prosecutor's statement he intended to use "all the convictions" for impeachment purposes belies appellant's assertion that he "chose to testify after the prosecutor represented he would use only two felony convictions for impeachment."

## B. *Evidence regarding prior incidents with officers*
### 1. Relevant proceedings

The prosecutor asked appellant if he had been "convicted of using a cane as a weapon," and appellant responded, "In trial and I lost." The prosecutor then asked him if his story at trial was that he was "a street performer." Appellant testified, "A deputy

18

said I swung my cane at him.  They had a video of the incident."  The court directed appellant to answer the questions.  Appellant denied spitting at the officers or saying, "Fuck you."

The prosecutor then asked about an incident with "a different police officer."  Appellant denied that he lifted a skateboard over his head and swung it at the officer and denied spitting on a police car and saying "fuck you" on this occasion.  The prosecutor asked whether "If [he] brought a police officer in here to say [appellant] did exactly that," would he be lying?  Appellant responded, "Of course."

The prosecutor proceeded, "Well, I guess let's go through the convictions and you tell me which police officers are lying."  The prosecutor asked whether on a certain occasion officers lied that appellant had resisted arrest, and appellant responded, "Yes."

The prosecutor asked appellant if "in 2019 [he was] arrested for resisting arrest and [was] ultimately convicted of it," to which appellant responded, "I'm not sure.  I don't recall."  He then asked appellant, "So you don't recall being convicted on January 3, 2020, of misdemeanor resisting arrest?"  Appellant responded, "I'm not sure."  Defense counsel objected, stating "It's improper."  The court asked, "What's improper about it?"  Defense counsel responded, "Misdemeanor conviction."  The court said, "It's still an act involving moral turpitude.  Overruled."  Defense counsel responded, "I believe it would require something different."  The court said, "The form of the question is incorrect.  So ask the question."

The prosecutor next asked, "Was the police officer involved in that incident lying?"  Appellant explained that he did not remember the incident and asked, "Was there any other charge

tied to these charges or just a bunch of resisting arrest charges?" The prosecutor said, "I'm not going to go through the whole criminal history—" and defense counsel objected to "counsel testifying" and argued "There's no evidence that there is a whole criminal history."

The parties approached the bench and the court asked, "Do you really want to go into the whole criminal history?" Defense counsel said, "No. I . . . asked [appellant] about the whole criminal history and my understanding when I asked him was to assume that [the prosecutor] would be limiting his questions to what's not remote, not misdemeanor convictions because that has to be proved by the actual behavior." "The way misdemeanors are handled is the question is, 'Did you do whatever it was on such and such date?' And, if not, the record of conviction is admissible to prove it."

On rebuttal, Sergeant Elbaz testified about an occasion in which he saw appellant swinging his cane, and then—upon making eye contact with officers—appellant took an aggressive stance and lifted his cane. Appellant spat in Sergeant Elbaz's direction, saying, "Fuck you." The prosecutor asked him how he reacted, and he responded, "I was in fear." Sergeant Elbaz explained that he was afraid "because [he] had encounters with [appellant] in the past," and that "[appellant has] fought with police officers." Defense counsel objected, stating, "Calls—calls for—" the court interjected: "It's his state of mind and it will be limited to his state of mind." The prosecutor proceeded to ask whether appellant has "fought with police officers as well as patrons in the area?" Defense counsel objected based on hearsay and foundation, and the court responded, "It goes to his state of

20

mind and it's being admitted solely to establish his state of mind, not for the truth of anything that's asserted therein."

## 2. Appellant's challenges to the prior misconduct evidence are without merit

Appellant argues that the trial court erred in overruling his objection to the question of whether appellant had been convicted on January 3, 2020, of misdemeanor resisting arrest; in ordering "appellant . . . to answer 'were officers lying' about the conduct underlying felony convictions appellant admitted"; and in letting the prosecutor ask appellant about the facts underlying his felony convictions.  Appellant has forfeited these arguments by failing to raise them below.  Defense counsel did not object to the "were they lying" questions, and the grounds stated for her objection to one of the questions regarding a misdemeanor conviction were: "it's improper"; "misdemeanor conviction"; and "it would require something different."  These utterances are too vague to preserve any argument on appeal.  (*People v. Demetrulias* (2006) 39 Cal.4th 1, 22 ["An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a 'placeholder' objection stating general or incorrect grounds . . . and revise the objection later . . . stating specific or different grounds"].)

Nor did appellant object on hearsay grounds to preserve any argument that the trial court improperly admitted evidence of his misdemeanor conviction.  (*Wheeler*, *supra*, 4 Cal.4th at p. 300 ["defendant waived any hearsay claim" with respect to admission of misdemeanor conviction by failing to object on that specific ground]; *Cadogan*, *supra*, 173 Cal.App.4th at p. 1515 [same].)  In any case, even though the court responded "overruled" to appellant's objection, it then required the

prosecutor to ask a different question—and that question involved the conduct underlying the conviction and not the fact of the conviction.  (*People v. Chatman* (2006) 38 Cal.4th 344, 373 [evidence of past misdemeanor conduct is admissible in the court's discretion, although misdemeanor convictions themselves are not because they constitute hearsay if offered "to show that the witness committed the underlying criminal conduct"]; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1459.)

Appellant alludes to section 352 in his opening brief and refers to the "inflammatory" nature of the prosecutor's questioning on "the fact of misdemeanor conviction," but he neither objected under section 352 below nor does he elaborate on appeal why its prejudicial effect substantially outweighs its probative value.  (*People v. Gomez* (2018) 6 Cal.5th 243, 286 ["Reviewing courts will generally not consider a challenge to the admissibility of evidence unless there was a ' " 'specific and timely objection in the trial court on the [same grounds] sought to be urged on appeal' " ' "]; *Doolin, supra*, 45 Cal.4th at pp. 437–438 [failure to assert section 352 challenge below results in forfeiture on appeal].)

Appellant next argues that the trial court erred in overruling his objection to the prosecutor's statement that he was " 'not going to go through [appellant's] whole criminal history,' " and not admonishing the jury with respect to that statement.  Appellant objected that the prosecutor was testifying.  (*People v. Visciotti* (1992) 2 Cal.4th 1, 52 ["a prosecutor may not examine a witness solely to imply or insinuate the truth of the facts about which questions are posed"].)  But it was not in dispute that appellant had a criminal history; indeed, defense counsel had asked appellant on direct examination about some of his prior

22

convictions. The prosecutor's mere statement that he would not go into that history did not amount to testimony or give rise to improper inferences, particularly given that the prosecutor was merely responding to appellant's question of whether "there [was] any other charge tied to" the charges the prosecutor was referring to.

Appellant contends the trial court erred in overruling defense counsel's objections to Sergeant Elbaz's statements that appellant has fought with police officers and patrons because those statements lacked proper foundation. The context of that testimony (he had just testified to having "had encounters" with appellant before) supports a reasonable inference that he had the requisite personal knowledge. (*People v. Johnson* (2018) 6 Cal.5th 541, 583 [only if no jury could reasonably find that the witness had personal knowledge may the trial court exclude a witness's testimony on that ground].) Appellant urges that "[t]he court failed to apply Evidence Code section 352" to Sergeant Elbaz's testimony, but he forfeited this challenge by failing to raise it below. (*People v. Valdez* (2012) 55 Cal.4th 82, 138.)

Finally, appellant argues that the conduct Sergeant Elbaz described of appellant's waving the cane and acting aggressively toward him lacked sufficient similarity to the charged offense to be admitted to show "intent." We disagree. "The least degree of similarity . . . is required in order to prove intent." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) Appellant's prior conduct is sufficiently similar to the charged act of swinging the cane at a security guard to permit the inference that appellant was acting as an aggressor rather than in self-defense or by accident when he hit the guard with his cane. (Cf. *People v. Cortes* (2011) 192 Cal.App.4th 873, 884, 916 [prior fistfights where defendant was

23

the aggressor were sufficiently similar to charged offense of murder (by stabbing) to support inference that the defendant harbored the same intent in each and "did not act accidentally . . . or in self-defense"].)  Therefore, even if appellant is correct that Sergeant Elbaz's state of mind was irrelevant, the evidence regarding his swinging the cane and acting aggressively was properly admitted to show "intent."  (See *People v. Cowan* (2010) 50 Cal.4th 401, 473, fn. 25 [" ' "we review the ruling, not the court's reasoning and, if . . . correct on any ground, we affirm" ' "].)

### C. *Admission of criminal history under section 1101, subdivision (b)*

Appellant argues that the trial court erred in sua sponte admitting all the criminal history evidence to show "intent" under section 1101, subdivision (b), and not just for impeachment purposes.  He also argues the court did so "without a section 352 balancing."

While discussing jury instructions outside the presence of the jury, the court explained it would give CALJIC No. 375 as a prophylactic measure because "there are a couple of different ways to look at [appellant's prior convictions] and the difference in dealing with his credibility, which is the actual fact of the convictions, the circumstances of those convictions would tend to be relevant to his intent and whether . . . it was a result of accident."

Appellant does not cite any part of the record where the trial court made a ruling contrary to its explanation for giving CALJIC No. 375.  Nor did appellant object under section 352 when the trial court made this statement.  The trial court had generally overruled appellant's objections to the testimony about

24

appellant's prior misconduct, and the jury instruction it gave properly instructed the jury on the purposes for which it could consider such evidence.[8] (*Doolin, supra*, 45 Cal.4th at p. 443 [we presume the jury followed instructions].) Appellant's argument also fails to recognize that the issue of appellant's credibility— with regard to his claim that he hit the guard by accident or in self-defense—and the issue of his "intent" are "inseparably intertwined." (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 118.)

Appellant relies on *People v. Hall* (2018) 23 Cal.App.5th 576 to argue that the trial court's decision to admit the prior conviction evidence to show "intent" deprived him of his Constitutional rights (to due process, confrontation, and effective assistance of counsel), but *Hall* is readily distinguishable. There, the prosecutor stated that he would not use the defendant's prior convictions for section 1101, subdivision (b) purposes, conceding that " 'their probative value is likely substantially outweighed by their prejudicial effect,' " but stated that he would only use them if the defendant opened the door about weapons or violence. (*Hall*, at p. 585.) The trial court ruled on a motion in limine,

---

[8] The jury instruction (CALJIC No. 375) included the language: "If you decide that the defendant committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purposes of deciding whether: [¶] The defendant acted with the intent to deter and prevent an executive officer from performing that officer's duty by means of force and violence; and, [¶] The defendant's alleged actions were the result of accident. . . . [¶] . . . [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."

excluding the defendant's misdemeanor conviction for carrying a dirk or dagger under section 352 because it was too prejudicial given that the defendant was charged with stabbing the victim. (*Hall*, at pp. 585–587.) But after the defendant testified that he lied to police because he was " 'deterred by fear,' " the trial court reasoned that this statement implied he was a peaceful person, thereby opening the door to evidence showing his violent character. (*Hall*, at pp. 585–589.) The Court of Appeal disagreed with this reasoning and held that the trial court's unjustified "midtestimony reversal of its prior ruling impermissibly burdened defendant's exercise of his right to testify without impeachment by evidence the court had already deemed more prejudicial than probative, deprived him of the right to counsel's intelligent assistance on whether to exercise his rights to testify or not to testify, and impaired his right to a fair trial." (*Id*. at p. 599.) This case is distinguishable because the prosecutor never conceded that the evidence of appellant's prior misconduct was inadmissible under section 352, the court never so ruled and thus never reversed such ruling, and appellant placed his "intent" at issue by claiming he hit the guard with his cane by accident and in self-defense.

Appellant's assertion that the prosecutor said he would only use two convictions is not borne out by the record. The prosecutor told the court he would use "all the convictions." Defense counsel was thus on notice that appellant's convictions, including the misdemeanor conviction, could be used to impeach appellant, which here went hand in hand with section 1101, subdivision (b)'s provision that nothing in section 1101 prohibits the use of evidence to show "intent." The same reasons lead us to reject appellant's related claim of prosecutorial misconduct

26

(which we reject for the additional reason that he failed to assert any prosecutorial misconduct below).

## III. Officer Jaen's Lay Testimony that Appellant Did Not Appear to be Having a Mental Breakdown

### A. *Relevant proceedings*

Officer Jaen testified that while he and another officer tried to get appellant out of the patrol vehicle to take him into the detention facility, appellant stated repeatedly that he was "having a mental breakdown." The prosecutor asked, "Did it appear to you like . . . [he] was having a mental breakdown?" Defense counsel objected based on lack of foundation, and the court overruled the objection, stating "it's his lay opinion." Officer Jaen responded, "Based off my interactions with the defendant up to that point I didn't believe that it was happening." Officer Jaen also testified that appellant was "vomiting at this point as well," which "appeared [to be] something he was able to control."

### B. *The trial court did not abuse its discretion*

Appellant argues that the trial court erred in admitting Officer Jaen's testimony that appellant did not appear to be having a mental breakdown and that appellant seemed to be able to make himself vomit. Appellant forfeited his challenge to the vomit-related testimony by not objecting to it below.

Lay opinion testimony is admissible if it is "[r]ationally based on the perception of the witness," and "[h]elpful to a clear understanding of his testimony." (Evid. Code, § 800, subds. (a)–(b); *People v. Dryden* (2021) 60 Cal.App.5th 1007, 1026.) When a lay witness offers testimony that goes beyond the facts personally observed, it is inadmissible. (*Dalton*, *supra*, 7 Cal.5th at p. 231; *People v. Jones* (2017) 3 Cal.5th 583, 602.) Examples of when the

27

admission of lay testimony has been upheld include when it was based on personal observation and concerned the extent of an accident victim's pain and suffering; whether a defendant was acting rationally; and whether a defendant was intoxicated. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1307.)

The trial court properly admitted Officer Jaen's testimony because it was based on his own observations—he commented on whether it appeared *to him* that appellant was having a mental breakdown, "based [on his] interactions with [appellant] up to that point." Officer Jaen supplied further foundation for his observation in stating he had "training and experience" that included "12 plus years . . . in dealing with a lot of types of medical injuries and illness," and "train[ing] on placing subjects on [Welfare and Institutions Code section] 5150 holds as far as evaluating them and having mental health illnesses." There was no abuse of discretion here.

IV.    **It Was Within the Trial Court's Discretion to Refuse to Admit Evidence on Reason for Appellant's Wheelchair and Helmet**

At the outset of appellant's direct examination, his counsel asked him why he could not walk any more, even though he had been able to walk with a cane on the date of the incident. The trial court sustained the prosecutor's objection to this question based on lack of relevance. Defense counsel then asked why appellant was wearing a helmet. The trial court sustained another objection for lack of relevance.

Appellant asserts that the trial court erred in refusing to admit appellant's testimony to explain how he became unable to walk after the incident and why he was wearing a helmet. Beyond stating, "It was . . . relevant for the jury to understand

why appellant presented as he did in court," appellant fails to explain said relevance, and none is apparent. In any case, any possible relevance is too remote for us to find an abuse of discretion.

## V. Appellant Forfeited His Prosecutorial Misconduct Claims

Appellant contends the prosecutor committed misconduct in improperly questioning appellant on "multiple felony thefts" involving violence, the facts underlying his felony convictions, and his being on probation and parole when he committed the crime at issue; and in arguing appellant lied based on a comparison of his testimony denying having lifted a skateboard against Sergeant Elbaz's testimony that appellant had waved a cane, which did not contradict appellant's statement.

Appellant concedes his counsel made no objections to preserve these claims on appeal. (*People v. Thomas* (2011) 51 Cal.4th 449, 491–492 [" ' "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety" ' "].) He argues that "such objection[s] would have been futile, in light of this record," and refers to his earlier argument that the trial court erred in overruling various objections during appellant's cross-examination. We rejected that earlier argument, and we reject appellant's otherwise bare assertion that objecting to prosecutorial misconduct would have been futile.

## VI. Appellant's Counsel Was Not Ineffective

Appellant argues that trial counsel was ineffective for failing to adequately object to the prosecutor's use of appellant's

criminal history, lay opinion testimony that she had successfully objected to at the preliminary hearing, and Sergeant Cooper's testimony that the officers had cause to believe appellant had committed a violent assault.

"An ineffective assistance of counsel claim has two elements:  a defendant must show that their counsel's performance was deficient, *and* that this deficient performance prejudiced the defense."  (*In re Tellez* (2024) 17 Cal.5th 77, 88; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674].)  "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  (*Strickland*, at p. 697.)  Prejudice means "a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 676.)

Appellant does not explain how his counsel's purported shortcomings prejudiced him, and our review of the record shows no reasonable probability of a different outcome had defense counsel objected as appellant urges she should have.  Even had such objections been made and sustained, the remaining evidence of appellant's guilt was overwhelming:  The guard, the manager, and multiple officers all attested to the facts supporting the various charges against appellant.  The evidence in his defense was relatively weak.

## VII.  Sufficient Evidence Supports the Mayhem Conviction

Appellant argues that the injury he inflicted on the guard was not sufficiently serious to support his mayhem conviction. Section 203 provides:  "Every person who unlawfully and

maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." (§ 203.) The statue " 'protects the integrity of the victim's person.' " (*People v. Santana* (2013) 56 Cal.4th 999, 1004 (*Santana*).) "Disfigurement of the body ' "impairs or injures the beauty, symmetry or appearance of a person or thing . . . [or] renders unsightly, misshapen or imperfect or deforms in some manner." ' " (*People v. Romero* (2019) 44 Cal.App.5th 381, 387.) Case law has " 'grafted' onto section 203 the requirement that a disfiguring injury be permanent" (*Santana*, at p. 1007), but it has also clarified that an injury can be "permanent" even "if modern technology effectively repairs the injury." (*Romero*, at p. 387.)

Appellant asserts that "chipped" and "shattered" teeth "are simply below the level of injury sufficient to establish mayhem." He neither cites any authority to support this position, nor addresses any cases that tend to undermine it. (See, e.g., *People v. Johnson* (2018) 21 Cal.App.5th 267, 281 ["The law of mayhem has evolved to such a degree that a number of cases have affirmed mayhem convictions based on relatively minor injuries"]; *People v. Caldwell* (1984) 153 Cal.App.3d 947, 952 [a bitten-through lower lip was mayhem]; *People v. Keenan* (1991) 227 Cal.App.3d 26, 35–36 [cigarette burns to both breasts supported mayhem]; *People v. Sekona* (1994) 27 Cal.App.4th 443, 457 [blinding of an eye from a kick was sufficient for mayhem].) Appellant also ignores the substantial evidence of the severity of the guard's injury: The guard testified that the blow to his mouth rendered his "raw nerve" exposed, "pushed back" his gums, altering his smile, and that eating has felt "weird" for him since the injury. He "ended up getting four root canals" and

"three different bridges."  This evidence was sufficient for the jury to find a serious and permanent disfigurement for the purpose of mayhem.  (See *Santana*, *supra*, 56 Cal.4th at p. 1012.)

## VIII. Cumulative Error and Constitutional Arguments

Appellant contends that he suffered prejudice from the cumulative effect of all the errors he has claimed, even if any error was alone harmless.  " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  Because we have rejected all of appellant's claims, we also reject his claim that he suffered prejudice from a cumulation of errors and that he was thus deprived of his right to due process.

Appellant asserted violations of his constitutional rights with respect to various of his claims.  Because we have rejected those claims, we necessarily reject his corresponding constitutional claims.  (*People v. Lamb* (2024) 16 Cal.5th 400, 416, fn. 5 [no separate constitutional discussion is required when rejection of claim on the merits necessarily leads to rejection of constitutional theory].)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

ASHMANN-GERST, J.

RICHARDSON, J.